HOKE COUNTY BOARD OF EDUCATION; HALIFAX COUNTY BOARD OF EDUCA-
TION; ROBESON COUNTY BOARD OF EDUCATION; CUMBERLAND COUNTY
BOARD OF EDUCATION; VANCE COUNTY BOARD OF EDUCATION; RANDY L.
HASTY, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF RANDELL B. HASTY; STEVEN R.
SUNKEL, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF ANDREW J. SUNKEL; LIONEL
WHIDBEE, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF JEREMY L. WHIDBEE; TYRONE
T. WILLIAMS, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF TREVELYN L. WILLIAMS; D.E.
LOCKLEAR, JR., INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF JASON E. LOCKLEAR;
ANGUS B. THOMPSON II, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF VANDALIAH J.
THOMPSON; MARY ELIZABETH LOWERY, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF
LANNIE RAE LOWERY; JENNIE G. PEARSON, INDIVIDUALLY AND AS GUARDIAN *AD LITEM*
OF SHARESE D. PEARSON; BENITA B. TIPTON, INDIVIDUALLY AND AS GUARDIAN *AD LITEM*
OF WHITNEY B. TIPTON; DANA HOLTON JENKINS, INDIVIDUALLY AND AS GUARDIAN *AD
LITEM* OF RACHEL M. JENKINS; LEON R. ROBINSON, INDIVIDUALLY AND AS GUARDIAN
*AD LITEM* OF JUSTIN A. ROBINSON, PLAINTIFFS AND ASHEVILLE CITY BOARD OF
EDUCATION; BUNCOMBE COUNTY BOARD OF EDUCATION; CHARLOTTE-
MECKLENBURG BOARD OF EDUCATION; DURHAM PUBLIC SCHOOLS
BOARD OF EDUCATION; WAKE COUNTY BOARD OF EDUCATION; WINSTON-
SALEM/FORSYTH COUNTY BOARD OF EDUCATION; CASSANDRA INGRAM,
INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF DARRIS INGRAM; CAROL PENLAND,
INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF JEREMY PENLAND; DARLENE HARRIS,
INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF SHAMEK HARRIS; NETTIE THOMPSON,
INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF ANNETTE RENEE THOMPSON; OPHELIA
AIKEN, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF BRANDON BELL, PLAINTIFF-
INTERVENORS v. STATE OF NORTH CAROLINA AND THE STATE BOARD OF EDU-
CATION, DEFENDANTS

No. 530PA02

(Filed 30 July 2004)

## 1. Parties— school board—motion to dismiss

The trial court did not err by denying defendants' motion to
dismiss the school boards as parties to the instant case, because
while the precise party designation of the school boards may not
have been readily discernible at the time of the trial, the nature
of the parties' claims was such that: (1) they sought a declaration
of rights, status, and legal relations of and among the parties; and
(2) any declaration of the rights, status, and legal relations of and
among the parties would affect the role played by the school
boards in providing the state's children with the opportunity to
obtain a sound basic education.

## 2. Pleadings— amendment—lack of prekindergarten services

The trial court did not err by denying defendants' motion to
strike an amendment to their complaint regarding the lack of
prekindergarten services and programs, because: (1) at the point

of the trial court's order, the question of the extent of the guar-
antees under *Leandro v. State*, 346 N.C. 336 (1997), giving every
child of this state an opportunity to receive a sound basic educa-
tion in our public schools, had yet to be answered and was ripe
for evidentiary proceedings and consideration by the trial court;
and (2) the General Assembly has enacted legislation that affords
certain rights to particular four-year-olds who would not other-
wise qualify as school children, namely those four-year-olds that
meet the criteria for being gifted and mature.

**3. Constitutional Law; Schools and Education— sound basic
education—opportunity to receive sound basic educa-
tion—State allocations**

The trial court did not err by concluding that the constitu-
tional mandate of *Leandro v. State*, 346 N.C. 336 (1997), estab-
lishing the opportunity for students to receive a sound basic
education, had been violated in the Hoke County School System
and by requiring the State to assess its education-related alloca-
tions to the county's schools so as to correct any deficiencies that
presently prevent the county from offering its students the oppor-
tunity to obtain a *Leandro*-conforming education, because the
evidence demonstrated: (1) poor standardized test scores; and
(2) that over the past decade an inordinate number of Hoke
County students have consistently.failed to match the academic
performance of their statewide public school counterparts and
that such failure, measured by their performance while attending
Hoke County schools, their dropout rates, their graduation rates,
their need for remedial help, their inability to compete in the job
markets, and their inability to compete in collegiate ranks, con-
stituted a clear showing that they have failed to obtain a *Leandro*-
comporting education.

**4. Constitutional Law— separation of powers—legislature—
establishing age for entering public schools**

The trial court erred by interfering with the province of the
General Assembly by establishing the appropriate age for stu-
dents entering the public school system, because: (1) our state's
constitutional provisions and corresponding statutes serve to
establish the issue as the exclusive province of the General
Assembly; and (2) there was no evidence at trial indicating the
trial court had satisfactory or manageable criteria that would jus-
tify modifying legislative efforts.

5. **Constitutional Law; Schools and Education— sound basic education—expansion of pre-kindergarten educational programs—at-risk students**

The trial court erred by directing the State to remedy constitutional deficiencies relating to the public school education provided to students in Hoke County by expanding pre-kindergarten educational programs so that they reach and serve all qualifying "at-risk" students, because the mandate requiring expanded pre-kindergarten programs amounts to a judicial interdiction that, under present circumstances, infringes on the constitutional duties and expectations of the legislative and executive branches of government.

6. **Constitutional Law; Schools and Education— sound basic education—federal funds—State obligation**

The trial court did not err by including educational services provided by federal funds in making its determination of whether the State is meeting its constitutional obligation to provide North Carolina's children with a sound basic education, because: (1) the trial court's consideration of Title I funds did not violate either the applicable federal statutory provisions or the education provisions of our state's Constitution; (2) the relevant provisions of the North Carolina Constitution do not forbid the State from including federal funds in its formula for providing the state's children with the opportunity to obtain a sound basic education; (3) the question of whether federal funds are properly being utilized by the State·is one best answered by consulting the federal statutory framework that provides for such funds; and (4) as the language of the applicable statutes expressly grants the United States Secretary of Education the power to decide the question of whether state expenditures of federal education funds comports with federal law, we defer to the Secretary's judgment and note that there was no evidence at trial showing that the State's use of such .funds had spurred retaliatory action by the Secretary.

On discretionary review pursuant to N.C.G.S. § 7A-31 (2003), prior to a determination by the Court of Appeals, of orders entered 24 November 1997 and 9 February 1999 and a judgment entered 4 April 2002, which explicitly incorporates memoranda of decisions dated 12 October 2000, 26 October 2000, and 26 March 2001 as amended by order dated 29 May 2001, all of which were entered by Judge Howard

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

E. Manning, Jr., in Superior Court, Wake County. Heard in the Supreme Court 10 September 2003.

*Parker, Poe, Adams & Bernstein, L.L.P., by Robert W. Spearman, for plaintiff-appellees.*

*Tharrington Smith, LLP, by Ann L. Majestic and Debra R. Nickels; and Hogan & Hartson, L.L.P., by Audrey J. Anderson, pro hac vice, for plaintiff-intervenor-appellants and -appellees.*

*Roy Cooper, Attorney General, by Edwin M. Speas, Jr., Chief Deputy Attorney General; Grayson G. Kelley, Senior Deputy Attorney General; Thomas J. Ziko, Special Deputy Attorney General, for defendant-appellants and -appellees.*

*Ann W. McColl on behalf of the North Carolina Association of School Administrators, amicus curiae.*

*Ferguson Stein Chambers Adkins Gresham & Sumter, P.A., by S. Luke Largess; and Thomas M. Stern on behalf of the North Carolina Association of Educators, amicus curiae.*

*Seth H. Jaffe on behalf of The American Civil Liberties Union Foundation, Inc.; Deborah Greenblatt on behalf of Carolina Legal Assistance, Inc.; Sheria Reid and Carlene McNulty on behalf of North Carolina Justice & Community Development Center; Gregory C. Malhoit on behalf of The Rural School & Community Trust; John Charles Boger on behalf of The University of North Carolina School of Law Center for Civil Rights; and Romallus O. Murphy on behalf of the North Carolina NAACP, amici curiae.*

ORR, Justice.

The State of North Carolina and the State Board of Education ("the State"), as defendants, appeal from a trial court order concluding that the State had failed in its constitutional duty to provide certain students with the opportunity to attain a sound basic education, as defined by this Court's holding in *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997). We affirm the trial court on this part of the State's appeal with modifications.

In addition, the State appeals those portions of the trial court's order that direct the State to remedy constitutional deficiencies relating to the public school education provided to students in Hoke County. In its memoranda of law, the trial court, in sum, ultimately

ordered the State to: (1) assume the responsibility for, and correct, those educational methods and practices that contribute to the failure to provide students with a constitutionally-conforming education; and (2) expand pre-kindergarten educational programs so that they reach and serve all qualifying "at-risk" students. As for the trial court's first remedy, we affirm, with modifications. As for the trial court's second remedy, we reverse, concluding that the mandate requiring expanded pre-kindergarten programs amounts to a judicial interdiction that, under present circumstances, infringes on the constitutional duties and expectations of the legislative and executive branches of government.

On cross-appeal, plaintiff-intervenors argue that the trial court erred by including educational services provided by *federal* funds in making its determination of whether the State is meeting its constitutional obligation to provide North Carolina's children with a sound basic education. We disagree with plaintiff-intervenors' contention and, therefore, affirm the trial court.

## I. Introduction

This case is a continuation of the landmark decision by this Court, unanimously interpreting the North Carolina Constitution to recognize that the legislative and executive branches have the duty to provide all the children of North Carolina the opportunity for a sound basic education. This litigation started primarily as a challenge to the educational funding mechanism imposed by the General Assembly that resulted in disparate funding outlays among low wealth counties and their more affluent counterparts. With the *Leandro* decision, however, the thrust of this litigation turned from a funding issue to one requiring the analysis of the qualitative educational services provided to the respective plaintiffs and plaintiff-intervenors.

In remanding this case to the trial court in *Leandro*, this Court issued the following directive: "If . . . [the trial] court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established." 346 N.C. at 357, 488 S.E.2d at 261. The Court then went on to conclude that if such a denial [of a fundamental right] is indeed established by the evidence, and defendants are unable· to justify such denial as necessary to promote a compelling government interest, "it will then be the duty of the [trial] court to enter a judgment granting

declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment upon the other branches of government." *Id.*

From the outset, we note that the ensuing trial lasted approximately fourteen months and resulted in over fifty boxes of exhibits and transcripts, an eight-volume record on appeal, and a memorandum of decision that exceeds 400 pages. The time and financial resources devoted to litigating these issues over the past ten years undoubtably have cost the taxpayers of this state an incalculable sum of money. While obtaining judicial interpretation of our Constitution in this matter and applying it to the context of the facts in this case is a critical process, one can only wonder how many additional teachers, books, classrooms, and programs could have been provided by that money in furtherance of the requirement to provide the school children of North Carolina with the opportunity for a sound basic education.

The *Leandro* decision and the ensuing trial have resulted in the thrust of the instant case breaking down into the following contingencies: (1) Does the evidence show that the State has failed to provide Hoke County school children with the opportunity to receive a sound basic education, as defined in *Leandro*; (2) if so, has the State demonstrated that its failure to provide such an opportunity is necessary to promote a compelling government interest; and (3) if the State has failed to provide Hoke County school children with the opportunity for a sound basic education *and* failed to demonstrate that its public educational shortcomings are necessary to promote a compelling government interest, does the relief granted by the trial court correct the failure with minimal encroachment on the other branches of government?

We note that defendants raise three issues on appeal. The first—whether the trial court applied the wrong standards for determining when a student has obtained a sound basic education—is essentially an argument that questions whether the evidence presented at trial adequately demonstrated a violation of the constitutional right at issue. As such, it will be addressed in this Court's substantive analysis of whether the trial court properly determined that plaintiff school children are being denied their fundamental right for an opportunity to receive a sound basic education. *See* Part IV of this opinion. Defendants' remaining issues, as argued in their brief, concern the appropriateness of the trial court's remedy of mandating pre-

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

kindergarten programs for "at risk" students and the question of whether the proper age at which children should be permitted to attend public school is a nonjusticiable political question reserved for the General Assembly. Both questions will be addressed in this Court's overall examination of the pre-kindergarten remedy issue. *See* Part V of this opinion.

## II. Procedural History of the Case

This civil action, initiated as a declaratory judgment action pursuant to N.C.G.S. § 1-253 (2003), commenced in 1994 when select students from Cumberland, Halifax, Hoke, Robeson, and Vance Counties, their respective guardians *ad litem*, and the corresponding local boards of education, denominated as plaintiffs, sought declaratory and other relief for alleged violations of the educational provisions of the North Carolina Constitution and the North Carolina General Statutes.

Plaintiffs were subsequently joined by select students from the City of Asheville, Buncombe County, Charlotte-Mecklenburg, Durham County, Wake County, and Winston-Salem/Forsyth County, their respective guardians *ad litem*, and the corresponding local boards of education, denominated as plaintiff-intervenors, who filed an additional complaint.

At trial, defendants moved to dismiss both complaints, arguing that: (1) the issues raised were nonjusticiable, *see* N.C.G.S. § 1A-1, Rule 12(b)(6) (2003); (2) the trial court lacked personal jurisdiction over defendants, *see id.*, Rule 12(b)(2); and (3) the trial court lacked subject matter jurisdiction over the claims, *see id.*, Rule 12(b)(1). The motion was summarily denied by the trial court and defendants immediately appealed.

On appeal, the Court of Appeals reversed, unanimously concluding that because the North Carolina Constitution does not embrace a qualitative standard of education, neither plaintiffs nor plaintiff-intervenors had raised a claim upon which relief could be granted. *See Leandro v. State*, 122 N.C. App. 1, 11, 468 S.E.2d 543, 550 (1996).

Plaintiffs appealed the Court of Appeals decision to this Court, contending that their claims raised substantial constitutional questions. Plaintiffs and plaintiff-intervenors (collectively "plaintiff parties") also petitioned this Court for discretionary review. Those petitions were allowed.

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

Upon review of the Court of Appeals decision, this Court affirmed in part, reversed in part, and remanded the case for further proceedings in Wake County Superior Court. *Leandro*, 346 N.C. at 358, 488 S.E.2d at 261. The surviving claims for trial included the following: (1) whether the State has failed to meet its constitutional obligation to provide an opportunity for a sound basic education to plaintiff parties, *id.* at 348, 488 S.E.2d at 255; (2) whether the State has failed to meet its statutory obligation, pursuant to Chapter 115C of the General Statutes, to provide the opportunity for a sound basic education to plaintiff parties, *id.* at 354, 488 S.E.2d at 259;[1] and (3) whether the *State's* supplemental school funding system is unrelated to legitimate educational objectives and, as a consequence, is arbitrary and capricious, resulting in a denial of equal protection of the laws for plaintiff-intervenors, *id.* at 353, 488 S.E.2d at 258.[2]

Upon remand, pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts, the case was designated as exceptional by Chief Justice Burley B. Mitchell, who assigned Superior Court Judge Howard E. Manning, Jr. to preside over all proceedings. Prior to trial, the trial court initiated and oversaw a series of meetings among all parties. Although there was no official record kept of those pre-trial conference discussions, the record on appeal, trial transcripts, and portions of the trial court's four memoranda of

---

1. In its analysis of the issues presented in *Leandro*, this Court concluded that the State's statutory educational obligations were essentially codifications of the State's educational obligations under the Constitution. As a consequence, while plaintiffs could pursue claims showing that the State violated various sections of chapter 115C, any showing of such violations must support plaintiffs' ultimate burden: to demonstrate that such violations contributed to depriving school children of the opportunity to receive a sound basic education.

In short, while *Leandro* ostensibly left three issues to be decided by the trial court, only one faces scrutiny in the instant appeal—whether the State has failed in its *constitutional* duty to provide Hoke County school children with the opportunity to receive a sound basic education. The issue of whether the State has failed in its *statutory* duty to provide Hoke County school children with a sound basic education has been subsumed, for all practical purposes, by the constitutional question. As for the third issue concerning *State* supplemental funding claims by plaintiff-intervenors, it is not yet ripe for consideration. For more on the plaintiff-intervenors' claims, *see* note 3, below.

2. This issue, concerning plaintiff-intervenors, although deemed viable by this Court in *Leandro*, is not before this Court in the appeal of the instant case. Plaintiff-intervenors will present evidence in support of their respective claims in a separate action that will commence sometime after the instant case has concluded. Thus, the Court will neither address nor decide in this opinion whether plaintiff-intervenors have shown that the *State's* supplemental school funding system is unrelated to legitimate educational objectives.

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

law reference key rulings made by the trial court during such meetings. We note, significantly, that two of the trial court's initial decisions limited the scope of the case before us.

First, the trial court ruled that the case should be bifurcated into two separate actions, with one addressing the claims of rural school district plaintiffs ("rural districts") and the other addressing the claims of large urban school district plaintiff-intervenors ("urban districts"). Accordingly, the first trial would be limited to plaintiffs' claims and a second trial, to be held after the first was concluded, would address the claims of plaintiff-intervenors.[3]

In its first memorandum of decision ("Memo I"), the trial court stated that all parties agreed to the bifurcated proceedings, and this Court notes that the record on appeal includes no assignment of error pertaining to the trial court's decision to bifurcate. As a result, our consideration of the case is properly limited to those issues raised in the rural districts' trial.[4]

Second, the trial court ruled that the evidence presented in the rural districts' trial should be further limited to claims as they pertain to a single district. The net effect of this ruling was two-fold: (1) that Hoke County would be designated as the representative plaintiff district, and (2) that evidence in the case would be restricted to its effect on Hoke County. In Memo I, the trial court again asserted that all parties agreed to the suggested procedure, and this Court notes that the record on appeal is devoid of any assignment of error concerning the decision. As a consequence, our consideration of the case is properly limited to the issues relating solely to Hoke County as raised at trial.[5]

---

3. The Court notes that the trial court permitted plaintiff-intervenors to participate fully in both discovery and the trial of the case focusing on the rural districts.

4. Because this Court allowed plaintiff-intervenors to argue the additional issue of how *federal* educational funds may be used and/or considered in our state's educational funding scheme, we must also consider and decide the merits of that issue, which is addressed separately following our analysis of the substantive issues arising from the Hoke County proceeding. See part VI of this opinion.

5. The Court recognizes that plaintiffs from the four other original rural districts—those from or representing Cumberland, Halifax, Robeson, and Vance Counties—were not eliminated as parties as a result of the trial court's decision to confine evidence to its effect on Hoke County schools. However, because this Court's examination of the case is premised on evidence as it pertains to Hoke County in particular, our holding mandates cannot be construed to extend to the other four rural districts named in the complaint. With regard to the claims of named plaintiffs from the other four rural districts, the case is remanded to the trial court for further proceedings that include, but are not necessarily limited to, presentation of relevant evidence by the parties, and findings and conclusions of law by the trial court.

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

### III. Procedural Developments

Before addressing the substantive issues before us, we feel it necessary to review several key procedural developments that have transpired since the case was remanded to the trial court. Plaintiffs filed their original complaint as a declaratory judgment action, seeking a declaration of their educational rights under the North Carolina Constitution and chapter 115C of the General Statutes. *See* N.C.G.S. § 1-253 (2003). In addition, once their educational rights were declared, plaintiffs sought: (1) to show that their declared rights were being violated by State-defendants and, if so demonstrated, (2) a court-imposed remedy that would correct the demonstrated violation(s). *See id.*; N.C.G.S. § 1-259 (2003).

While in *Leandro*, the issue before this Court dealt with the correctness of a Rule 12(b)(6) dismissal of plaintiffs' case, this Court, in effect, answered plaintiffs' initial inquiry under the Declaratory Judgment Act, thereby providing the "rights, status and legal relations" for the trial court's further consideration. To wit: The state Constitution guarantees plaintiffs a right to the opportunity to receive a sound basic education from the State. *Leandro*, 346 N.C. at 351, 488 S.E.2d at 257. Then, after defining the qualitative components of what constitutes a sound basic education, the Court in *Leandro* remanded the case to the trial court and, in effect, assigned that court three specific tasks: (1) to take evidence on the issue of whether defendants "are denying the children of the state a sound basic education," (2) to determine if the evidence showed plaintiff school children's education-related rights were being denied, and (3) to "enter a judgment granting declaratory relief and such other relief as needed." *Id.* at 357, 488 S.E.2d 261.

At that point in the litigation, the case included five distinct parties: (1) plaintiff school children (and their respective guardians), (2) plaintiff local school boards, (3) plaintiff-intervenors, (4) the State Board of Education, and (5) the State. At that juncture, all participants sought a decree defining what rights and obligations were at stake, which parties had obligations, and which parties had rights as a result of such obligations. In *Leandro*, this Court, in sum, decreed that the State and State Board of Education had constitutional obligations to provide the state's school children with an

Moreover, the Court emphasizes that its holding in the instant case is not to be construed in any fashion that would suggest that named plaintiffs from the four other rural districts are precluded from pursuing their claims as presented in their complaint.

opportunity for a sound basic education, and that the state's school children had a fundamental right to such an opportunity. 346 N.C. at 351, 488 S.E.2d at 257. As a result of the decree, adversarial sides were clearly drawn for four of the five parties—plaintiff school children and plaintiff-intervenor school children (who, under the decree, enjoyed the right of educational opportunity), versus the State and State Board of Education (which, under the decree, were obligated to provide such opportunity).

Before addressing the party status of the school boards, we note that the evidence presented in this case reaches a broader constituency than the two designated plaintiff-school children in the case's caption. In fact, a far greater proportion of the evidence pertains to the circumstances of Hoke County's student population in general than it does to the named plaintiffs in particular. Thus, as a threshold question, we address whether the evidence presented concerning the plight of Hoke County's student population is relevant to the question of whether the named plaintiffs have been denied their right to an opportunity to obtain a sound basic education.

In our view, the nature of a declaratory judgment action and the mandate of *Leandro* combine to afford the trial court and the participating parties greater evidentiary leeway than in a conventional civil action. In declaratory actions involving issues of significant public interest, such as those addressing alleged violations of education rights under a state constitution, courts have often broadened both standing and evidentiary parameters to the extent that plaintiffs are permitted to proceed so long as the interest sought to be protected by the complainant is arguably within the "zone of interest" to be protected by the constitutional guaranty in question. *See, e.g., Seattle Sch. Dist. v. State*, 90 Wash. 2d 476, 490-95, 585 P.2d 71, 80-83 (1978).

Because the instant case concerns an issue of significant, if not paramount, public interest (school-aged children's rights concerning a public education), we will examine the trial court's evidentiary findings in the context of whether the supporting evidence demonstrates that a harm has occurred to those "within the zone" to be protected by the constitutional provision at issue. In our view, the instant plaintiffs, as Hoke County students, are certainly positioned within such a zone. As a consequence, evidentiary issues in this case will be scrutinized on the basis of whether there has been: (1) a clear showing of harm to those within the zone of protection afforded by the constitutional provision(s); and (2) a showing that any remedy imposed

by the court will redress the harm inflicted on those within such a zone of protection.

In our view, the unique procedural posture and substantive importance of the instant case compel us to adopt and apply the broadened parameters of a declaratory judgment action that is premised on issues of great public interest. The children of North Carolina are our state's most valuable renewable resource. If inordinate numbers of them are wrongfully being denied their constitutional right to the opportunity for a sound basic education, our state courts cannot risk further and continued damage because the perfect civil action has proved elusive. We note that the instant case commenced ten years ago. If in the end it yields a clearly demonstrated constitutional violation, ten classes of students as of the time of this opinion will have already passed through our state's school system without benefit of relief. We cannot similarly imperil even one more class unnecessarily. As a consequence, for this case, one of great public interest, we adopt the view that plaintiffs in this declaratory judgment action were entitled to proceed in their efforts towards showing that students within Hoke County have been wrongfully denied their educational rights under the North Carolina Constitution. Thus, the named plaintiffs here were not limited to presenting evidence at trial that they had suffered individual harm or that any remedy imposed specifically targeted them and them alone. Consequently, the Court will examine whether plaintiffs made a clear showing that harm had been inflicted on Hoke County students—the "zone of interest" in this declaratory judgment action—and whether the trial court's imposed remedies serve as proper redress for such demonstrated harm.

[1] In the wake of this Court's decree in *Leandro* and upon remand to the trial court, the party status of the local school boards immediately became a subject of dispute between the designated parties, and the school boards' capacity to seek redress remains an issue in this litigation. At trial, the State and State Board of Education, as defendants, argued that since the local boards had no right to an opportunity for a sound basic education, they lacked the capacity to sue as plaintiffs for an alleged violation of such a right. The trial court denied defendants' motion to dismiss the local boards as parties to the case. We conclude that the trial court was correct.

Although defendants assign error to the trial court's decision to allow the local school boards to continue as parties in the civil action at issue, they offer no arguments to that effect in their brief to this

Court. As a consequence, the issue is considered abandoned under this Court's appellate rules. N.C. R. App. P. 28(b)(6) (2004). However, because subsequent litigation in this case might properly present this issue, we will address the merits. Our examination of the issue reveals no reason to disturb the conclusion of the trial court. Throughout the trial, the school boards, as administrators and over- seers of their respective districts, were positioned as interested par- ties who participated in providing educational services to student plaintiffs. As such, the school boards clearly held a stake in the trial court's determination of whether or not the student plaintiffs were being denied their right to an opportunity to obtain a sound basic education. At trial, defendants argued that the school boards should be dismissed as parties because, as state-created entities, they enjoyed no entitlement to the right established in *Leandro*—namely, a child's individual right of an opportunity to a sound basic educa- tion. While it is true that the school boards are not among those endowed with such a right, and thus they have no justiciable claims based on its infringement or denial, in our view, the school boards were properly maintained as parties because the ultimate decision of the trial court was likely to: (1) be based, in significant part, on their role as education providers; and (2) have an effect on that role in the wake of the proceedings.

Although the parties in this case are referred to as plaintiffs and defendants, we note that this civil action was filed as a declaratory judgment action pursuant to section 1-253 of the General Statutes. While such actions require that there be a genuine controversy to be decided, *see Lide v. Mears*, 231 N.C. 111, 117-18, 56 S.E.2d 404, 409 (1949), they do not require that the participating parties be strictly designated as having adverse interests in relation to each other. In fact, declaratory judgment actions, by definition, are premised on providing parties with a means for "[c]ourts of record . . . to declare rights, *status, and other legal relations*" among such parties. N.C.G.S. § 1-253 (emphasis added). In addition, section 1-260 of the General Statutes declares plainly that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any inter- est which would be affected by the declaration." N.C.G.S. § 1-260 (2003). Thus, while the precise party designation—*i.e.*, plaintiffs—of the school boards may not have been readily discernible at the time of the trial, the nature of the parties' claims was such that: (1) they sought a declaration of rights, status, and legal relations of and among the parties; and (2) any declaration of the rights, status, and legal relations of and among the parties would affect the role played

by the school boards in providing the state's children with the opportunity to obtain a sound basic education. As a result, we conclude that the trial court did not err in denying defendants' motion to dismiss the school boards as parties to the instant case.[6]

Defendants also assign error to one of two amendments plaintiffs made to their complaint in the wake of the *Leandro* decision. On 23 January 1998, plaintiffs first amended their existing complaint to replace paragraphs 2, 4, 9, and 11, providing for substitute plaintiff-school children from Hoke, Halifax, Cumberland, and Vance Counties. The changes also included the addition of paragraph 7(a), which provided for a plaintiff-schoolchild from Robeson County. The amendments of 23 January 1998 were allowed by the trial court, without any objection by the State.

[2] However, the State did object to a subsequent amendment, which was added by plaintiffs at the behest of the trial court. The newly amended complaint, dated 15 October 1998, added paragraph 74(a), which reads as follows:

> Many children living in poverty in plaintiff districts begin public school kindergarten at a severe disadvantage. They do not have the basic skills and knowledge needed for kindergarten and as a foundation for the remainder of elementary and secondary school. In view of the lack of prekindergarten services and programs in these districts, many children living in poverty as well as other children are not receiving an opportunity for a sound basic education. The plaintiff school districts do not have sufficient resources to provide the prekindergarten and other programs and services needed for a sound basic education.

In its motion and arguments to the trial court, the State contended that "the new allegations pertain to matters that are wholly irrelevant to the question whether any plaintiff student is being denied" his or her right to an opportunity for a sound basic education. In addition, the State argued that any question concerning the proper age for public school eligibility or attendance was a purely political question, and as such was nonjusticiable under separation of powers principles. *See, e.g., Lake View Sch. Dist. v. Huckabee*, 351 Ark. 31, 82, 91 S.W.3d 472, 502 (2002) (holding that implementing pre-kindergarten programs was a policy matter reserved for the legislature and that the

---

6. The proper party designation of the school boards became evident in the trial court's ruling on the substantive claims raised in plaintiffs' complaint. *See* Part IV, below.

trial court had no authority to order the legislature to establish them, even as a remedy for constitutionally inadequate schools), *cert. denied,* 538 U.S. 1035, 155 L. Ed. 2d 1066 (2003).

However, in denying defendants' motion to strike the amendment, the trial court, in an order dated 9 February 1999, concluded that "under the *Leandro* doctrine and the North Carolina Constitution, the right to an opportunity to receive a sound basic education in the public schools is not to be conditioned upon age, but rather upon the need of the particular child." As a consequence, the trial court found that the added paragraph "*adequately allege[s]* that the lack of pre-kindergarten programs deprives certain children of the opportunity for a sound basic education," (emphasis added,) and ruled that such allegations raised a valid factual question to be determined upon the evidence presented.

We agree with the trial court's ruling, at least to the extent that it permitted plaintiffs to present evidence on the issue, for two reasons. In *Leandro*, this Court held that the state's Constitution "guarantee[s] every child of this state an opportunity to receive a sound basic education in our public schools." 346 N.C. at 347, 488 S.E.2d at 255. However, the extent of the guarantee, as expressed in *Leandro*, was not entirely clear. Is it limited to those children who attain school-age eligibility, as determined by the General Assembly, or does it extend to those about to enter the public school system? In other words, are four-year-olds guaranteed the right to demonstrate that they are in danger of being denied an opportunity for a sound basic education by virtue of their circumstances or are they precluded from doing so because they are not yet members of the right-bearing school children class? At the point of the trial court's order, that question had yet to be answered and, in our view, was ripe for evidentiary proceedings and consideration by the trial court. We also find persuasive the trial court's finding that the General Assembly has enacted legislation that affords certain rights to particular four-year-olds who would not otherwise qualify as school children—namely, those four-year-olds that meet the criteria for being "gifted" and "mature." Section 115C-364(d) of the General Statutes entitles such four-year olds to enroll in kindergarten. Keeping in mind that the *pre-trial* question at issue was not whether the trial court properly determined that either "at-risk" or other four-year-olds are similarly positioned in relation to their four-year-old "gifted" and "mature" counterparts, but rather whether the former group may present evidence showing they are or should be considered as similarly positioned, we conclude that ·

the trial court properly denied the State's motion to strike paragraph 74a of the amended complaint. Thus, any relevant evidence concerning the allegations in paragraph 74a was properly determined to be admissible at trial.

We conclude our evaluation of the case's procedural posture with a caveat concerning the trial court's characterization of this Court's holding in *Leandro*. "Under the *Leandro* doctrine and the North Carolina Constitution," the trial court concluded, "the right to an opportunity to receive a sound basic education in the public schools is not to be conditioned upon age but *rather upon the need of the particular child.*" (Emphasis added.) This Court disagrees with the italicized portion of the trial court's characterization. We read *Leandro* and our state Constitution, as argued by plaintiffs, as according the right at issue to all children of North Carolina, regardless of their respective ages or needs. Whether it be the infant Zoë, the toddler Riley, the preschooler Nathaniel, the "at-risk" middle-schooler Jerome, or the not "at-risk" seventh-grader Louise, the constitutional right articulated in *Leandro* is vested in them all. As a consequence, we note that the initial question before us is not whether that right exists but whether that right was shown to have been violated. In addition, we note that if such a violation was indeed established by the evidence at trial, this Court must then consider whether the trial court properly determined when and how the right was violated, by whom, and finally, if the remedy imposed was appropriate.

## IV. Defendants' First Issue

The Court now turns its attention to the substantive issues brought forward on appeal by the State. In its first question presented to this Court, the State contends that the trial court erred by applying the wrong standards for determining: (1) when a student has obtained a sound basic education; (2) causation (for a student's failure to obtain a sound basic education); and (3) the State's liability (for a student's failure to obtain a sound basic education).[7] In further support of its initial argument, the State proffers three subarguments, which allege and target specific evidentiary lapses and flaws in the trial court's reasoning. In its argument labeled I(A), the State contends that the trial court erred by using standardized test scores as

7. Although we cannot be certain, from our reading of the State's brief, it appears that the locution "wrong standards" is a misnomer, and translates more accurately as an argument concerning evidentiary sufficiency. Thus, we approach the State's first issue from a perspective of whether the trial court utilized relevant and sufficient evidence as a basis for its conclusions.

"the exclusive measure" of whether students were obtaining a sound basic education. In argument I(B), the State argues that the trial court erred by concluding that a denial of the right to a sound basic education could be inferred from the number of socio-economically disadvantaged ("at-risk") students scoring below Level III proficiency on standardized tests. And in argument I(C), the State contends that the trial court erred when it held the State responsible for administrative decisions made by local school boards.

From a purely structural standpoint, the Court finds it difficult to construct its opinion on this issue in a fashion that strictly comports with the State's presentation. The State presents an initial question that breaks down into three separate parts, then offers three subarguments without referencing which part of the primary argument they are intended to support. Further compounding the logistical problem is—how best to say?—the "free-wheeling nature" of the trial court's order, which is composed of four separate memoranda of law that total over 400 pages. We recognize that the trial court faced a formidable task in evaluating the evidence presented at trial and emphasize that our characterization of the order is not intended to be critical of the trial court's efforts. Nevertheless, the order's relevant conclusions—those under assault by the State in its first question presented—are peppered throughout the breadth of the document and do not correspond, from any structural standpoint, to the State's arguments. As a consequence, the Court is left with no choice but to chart a course of its own. Generally, we will structure this section in line with the State's initial three-part question: Did the trial court apply the wrong standards for determining: (1) when a student has failed to obtain a sound basic education; (2) causation for any such proven failure; and (3) the State's liability for such failure? While working within that basic framework, we will also address, as appropriate, the State's three supporting subarguments.

In *Leandro*, this Court decreed that the children of the state enjoy the right to avail themselves of the opportunity for a sound basic education. 346 N.C. at 347, 488 S.E.2d at 255 ("We conclude that Article I, Section 15[8] and Article IX, Section 2[9] of the

---

8. "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15.

9. "The General Assembly shall provide . . . for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2(1).

North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools.") (footnotes added). The Court then proceeded to declare that "[a]n education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate." *Id.* at 345, 488 S.E.2d at 254. Ultimately, the Court defined a sound basic education as one that provides students with at least: (1) sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in formal education or gainful employment in contemporary society. *Id.* at 347, 488 S.E.2d at 259.

After declaring a child's constitutional right to the opportunity to receive a sound basic education and defining the elements of such an education, the Court concluded that some of the allegations in plaintiffs' complaint stated claims upon which relief may be granted and ordered the case remanded to the trial court to permit plaintiffs to proceed on such claims. *Id.* at 355, 488 S.E.2d at 261. The Court in *Leandro* also provided instructive guidelines to the trial court, delineating a list of evidentiary factors the trial court should consider at trial. *Id.* at 355-57, 488 S.E.2d at 259-60. Among such factors were: (1) the level of performance of the children on standardized achievement tests; (2) any educational goals and standards adopted by the legislature;[10] (3) the level of the State's general educational expenditures and per-pupil expenditures; and (4) any other factors that may be relevant for consideration when determining educational adequacy issues under the Constitution. *Id.* Finally, the Court in *Leandro* established the standard of proof plaintiffs must meet in making their case. *Id.* at 357, 488 S.E.2d at 261. "[T]he courts of the state must grant every reasonable deference to the legislative and executive branches

---

10. The Court in *Leandro* additionally suggested that "output" measurements—such as student test scores, grades, and graduation rates—may prove more reliable than measurements of "inputs"—such as educational expenditures and program initiatives provided by the State.

when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education[,]" and "a clear showing to the contrary must be made before the courts may conclude that they have not." *Id.* "Only such a clear showing will justify a judicial intrusion into an area so clearly the province, *initially at least,* of the legislative and executive branches as the determination of what course of action will lead to a sound basic education." *Id.* (emphasis added).

[3] We begin our examination under the umbrella of the State's first argument—namely, whether there was a clear showing of evidence supporting the trial court's conclusion that "the constitutional mandate of *Leandro* has been violated [in the Hoke County School System] and action must be taken by both the LEA [Local Educational Area] and the State to remedy the violation." After a comprehensive examination of the record and arguments of the parties, this Court concludes that the trial court was correct as to this issue and thus we affirm, albeit with modifications. Discussion of the trial court's imposed remedies concerning specific violation(s) will immediately follow.

At trial, plaintiffs presented evidence that, in accordance with *Leandro,* can be categorized as follows: (1) comparative standardized test score data; (2) student graduation rates, employment potential, post-secondary education success (and/or lack thereof); (3) deficiencies pertaining to the educational offerings in Hoke County schools; and (4) deficiencies pertaining to the educational administration of Hoke County schools. The first two evidentiary categories fall under the umbrella of "outputs," a term used by educators that, in sum, measures student performance. The remaining two evidentiary categories fall under the umbrella of "inputs," a term used by educators that, in sum, describes what the State and local boards provide to students attending public schools. We examine each evidentiary category in turn.

Plaintiffs presented extensive documentary evidence concerning standardized test scores of students in Hoke County and from around the state, and provided testimony from educational experts for purposes of evaluating Hoke County's tests scores and comparing them with other test scores from around the state. The aim of the standardized test score evidence was twofold. First, plaintiffs sought to demonstrate that the measure of test score constitutional compliance was whether an ample number of Hoke County students were attaining a "Level III" proficiency in the subjects tested. Second,

plaintiffs sought to demonstrate that too many Hoke County students were failing to achieve the required "Level III" proficiency. Thus, in plaintiffs' view, if "Level III" proficiency is required, and an inordinate number of Hoke County students are failing to meet it, such a finding would contribute to a clear and convincing showing that Hoke County students were being denied an opportunity to obtain a sound basic education. *See Leandro*, 346 N.C. at 355, 488 S.E.2d at 259 (stating that standardized achievement tests are one factor the trial court should consider in determining whether any of the state's children are being denied the opportunity for a sound basic education).

At trial, plaintiffs presented evidence concerning standardized End of Grade (EOG) and End of Class (EOC) test scores and argued that the scoring standard of Level III proficiency should be used as the measure of whether a student had obtained a sound basic education in the subject area being tested. The State Board of Education has defined Level III proficiency thusly: "Students performing at this level consistently demonstrate mastery of the course subject matter and skills and are well prepared to be successful at a more advanced level in the content area." In contrast, the State argued that the standards in *Leandro* are satisfied when a student achieves Level II proficiency. The State Board of Education defines Level II proficiency thusly: "Students performing at this level demonstrate inconsistent mastery of knowledge and skills of the course and are minimally prepared to be successful at a more advanced level in the content area."

After considering the evidence and arguments from both sides, the trial court ruled that Level III proficiency was the required standard. The trial court rejected the State's argument that Level II proficiency more closely describes the "minimal level of performance which is indicative of a student being on track to acquire" a *Leandro*-comporting education and concluded that: (1) "a student who is performing below grade level (as defined by Level I or Level II) is not obtaining a sound basic education under the *Leandro* standard"; and (2) "a student who is performing at grade level or above (as defined by Level III or Level IV) is obtaining a sound basic education under the *Leandro* standard."

On appeal, although the State assigned error to the trial court's conclusion concerning the Level III standard, it made no argument to that effect in its brief. As a consequence, the issue is considered abandoned under the appellate rules. N.C. R. App. P. 28(b)(6). In addition, our own examination of the issue reveals no grounds to disturb the trial court's findings and preliminary conclusions pertaining to

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

the question of which test score standard should be used. As a consequence, we find no error in the trial court's ruling that a showing of Level III proficiency is the proper standard for demonstrating compliance with the *Leandro* decision.

With Level III proficiency established as the standard-bearer for test score evidence, we turn our attention to whether the number of Hoke County students failing to achieve Level III proficiency is inordinate enough to be considered an appropriate factor in the trial court's determination that a large group of Hoke County students have been improperly denied their opportunity to obtain a sound basic education.

At trial, EOG and EOC test scores from across the state and from Hoke County were submitted into evidence. In addition, education and testing experts were called to testify about what the scores mean, how statewide scores compare to those of Hoke County, and what such comparisons might indicate. In its third memorandum of decision, the trial court initially assessed the quantitative elements of the test score evidence and concluded that it clearly shows that Hoke County students are failing to achieve Level III proficiency in numbers far beyond the state average. In turn, the trial court then proceeded to conclude that the failure of such a large contingent of Hoke County students to achieve Level III proficiency is indicative that they are not obtaining a sound basic education in the subjects tested. As a consequence, the trial court ultimately concluded that the test score statistics and their analysis qualified *as contributing evidence* that Hoke County students were being denied their constitutional right to the opportunity for a sound basic education. In other words, evidence tending to show Hoke County students were faring poorly in such standardized test subject areas as mathematics, English, and history was relevant to the primary inquiry: Were Hoke County students being denied the opportunity to obtain an education that comports with the *Leandro* mandate—one in which students gain sufficient knowledge of fundamental math, science, English, and history in order to function in society and/or to engage in post-secondary education or vocational training. 346 N.C. at 347, 488 S.E.2d at 255. We agree with the trial court's assessment that test score evidence indicating Hoke County student performance in subject areas that correspond to the very core of this Court's definition of a sound basic education is relevant to the inquiry at issue.[11]

---

11. We note that the test score evidence, in and of itself, addresses the question of whether students are obtaining a sound basic education rather than the question of

In analyzing the test score data and the opinions of those who testified about them, the trial court noted that the score statistics showed that throughout the 1990s, Hoke County students in all grades trailed their statewide counterparts for proficiency by a considerable margin. For example, in 1997-98, only 46.9% of Hoke students scored at Level III or above in algebra while the state average was 61.6%. Similar disparities occurred in other high school subjects such as Biology, English, and American History. Other test data reflected commensurate results in lower grades. For example, in grades 3-8, Hoke County students trailed the state average in each grade, with gaps ranging from 11.7% to 15.1%.

In addition, the trial court noted that Hoke County students fared poorly in comparison with the state's other students in computer skills testing (51.2% passing in Hoke, 74.8% passed statewide), and the "high school" competency test (52.7% passed in Hoke, 68.4% passed statewide). The trial court also considered the findings of a state education assistance team, who worked at South Hoke Elementary School. The team determined that test scores showed Hoke County elementary school students were deficient in higher order thinking skills, such as problem solving.

In assessing the data and associated evidence and testimony, the trial court concluded that the test results showed Hoke County students were performing throughout the 1990s at deficient academic levels. As a consequence, the trial court deemed the evidence relevant to the preliminary question of whether Hoke County students were obtaining a sound basic education and the ultimate question of whether they were being denied an opportunity to obtain such an education.

In its brief, the State contends, at great length, that the trial court erred by using test scores "as the exclusive measure of a con-

---

whether they were afforded their opportunity to obtain one. The distinction is important. While a clear showing of a failure to obtain a sound basic education is a prerequisite for demonstrating a legal basis for the *designated plaintiff school children's* case, the failure to obtain such an education is not the ultimate issue in dispute.

In order to prevail, plaintiffs must show more than a failure on the part of Hoke County students to obtain a sound basic education. The failure to obtain such an education may be due to any number of reasons beyond the defendant State's control, not the least of which may be the student's lack of individual effort and a failure on the part of parents and other caregivers to meet their responsibilities. Thus, in order to show Hoke County students are being wrongfully denied their rightful opportunity for a sound basic education, plaintiffs must show that their failure to obtain such an education was due to the State's failure to provide them with the opportunity to obtain one.

stitutionally adequate education." However, as we proceed in our analysis, the Court notes that the record reflects that the trial court considered "output" evidence beyond the realm of test scores, and that evidence such as graduation rates, dropout rates, post-secondary education performance, employment rates and prospects, comports with both this Court's definition of a sound basic education *and* the factors we provided the trial court to consider upon remand. Thus, we reject the State's contention that the trial court used test scores as the "exclusive measure" of a sound basic education.

In continuing our examination of the trial court's order, we move next to the trial court's conclusion that additional "output" evidence—*e.g.*, graduation rates, dropout rates, employment potential, and post-secondary education readiness—further demonstrates that an unacceptably high number of Hoke County students are failing to obtain a sound basic education. In considering evidence concerning dropout and graduation rates, the trial court found that in the mid-1990s only 41% of Hoke County freshmen went on to graduate—a retention rate that was 19% lower than the state average and was the worst retention rate in the state's 100 counties. The trial court went on to conclude that the evidence showed that the primary reason Hoke County's dropout rate was so high was that a great number of Hoke students are "not well prepared for high school" and that "students who do not do well in the early grades are more likely than other students to later drop out of school."

As for the effect of such a high dropout rate, the trial court concluded that the failure of large percentages of Hoke County students to complete high school "not only results in those children who leave having failed to obtain a sound basic education" but is also evidence "of a systematic weakness . . . in meeting the needs of many of [Hoke County's] students."

As for those students who did graduate, the trial court's assessment was no less bleak. After considering evidence concerning the employment potential and post-secondary education potential for Hoke County graduates, the trial court concluded that many among the graduates had not obtained a sound basic education in that the evidence showed "they are poorly prepared to compete on an equal basis in gainful employment and further formal education in today's contemporary society." In support of its conclusion, the trial court cited to numerous examples of Hoke County graduates who pursued employment or who pursued further education at the college level.

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

For example, evidence from Hoke County employers indicated that local graduates "are not qualified to perform even basic tasks that are needed for the jobs available." At least three of Hoke County's major employers testified and/or offered evidence at trial, and all three described similar problems in considering Hoke graduates for employment. The president of a farm services company testified that he frequently received applications from Hoke graduates for entry-level positions at his firm. Such positions require the employee to read labels on products and to perform basic math skills, such as calculating chemical percentages for fertilizer mixing. According to the witness, Hoke graduate applicants often lacked such basic reading and math skills and as consequence, they had to be specially trained. A representative from Burlington Industries offered a similar perspective. Entry-level employees at his plant must be able to operate machinery and to use computers, and many of the local applicants lacked the basic skills required to learn how to run the machines or computers. As a result, the company developed a remedial program called REACH, which is a computer-based learning program that teaches reading, math, and computer literacy skills. The goal of the program is to bring new employees up to a 10.9 grade level for basic math, reading and computer skills. Nearly 180 Hoke high school graduates have participated in the program. Of those, 26 percent entered in the REACH course at below the seventh-grade level and 67 percent initially tested at the ninth-grade level or below. Hoke County high school graduates who applied to Unilever, another major local employer, yielded similar test scores, and none was hired by the company. According to a company representative, many of the Hoke County graduate applicants showed poor writing skills and an inability to follow instructions in their applications. Similar application and skills shortcomings were described by a fourth employer, who said one out of twenty-seven Hoke County high school graduates had been hired by his firm, a turkey hatchery.

As a consequence of such testimony, the trial court concluded that plaintiffs had demonstrated that even a Hoke County high school diploma failed to provide graduates with the skills necessary to compete on an equal basis with others in contemporary society's gainful employment ranks, which is one of the four measures defining a constitutionally conforming sound basic education. In our view, the trial court's conclusion is amply supported by the evidence, and further supports the trial court's ruling that a disproportionate number of Hoke County school children are failing to obtain a sound basic education.

As for Hoke County graduates who pursue post-secondary education options, the trial court concluded that Hoke County graduates "are generally not well prepared to go on to community college or into the university system." In its memoranda of law, the trial court approached the post-secondary education question thusly: "[I]n determining whether [Hoke County schools are] providing a sound basic education, it is relevant to consider college admission and performance data and whether students graduating from [Hoke County schools] need remediation in order to do post-secondary education work." In addition to considering evidence concerning Hoke County graduates' ability to perform upon entering the collegiate ranks, the trial court also weighed evidence concerning their ability to complete post-secondary education studies.

For example, the evidence presented at trial showed that 55 percent of Hoke County graduates attending community college in 1996 were placed in one or more remedial classes for core subjects such as reading and mathematics. In addition, Hoke County graduates' grades for such courses were poor; as a group, they averaged a 1.8 (D+) on a four-point scale in remedial reading and a 2.1 (C-) in remedial math. Of those Hoke County graduates taking regular math and science courses at the community college level, the average grades were, respectively, a 1.8 (D+) and a 1.8 (D+).[12]

Evidence concerning those Hoke County graduates who attended North Carolina's university (UNC) system demonstrated their prospects were even worse. Hoke County graduates in the UNC system were required to take remedial core courses at nearly double the rate of the statewide counterparts. Moreover, Hoke County graduates were placed in advanced placement English classes at half the rate (6.4%) of public school students from around the state (12.2%), and not one of Hoke County's forty-seven entering freshman enrolled in honors courses. Students from the state's other ninety-nine counties enrolled in honors courses at a 6.7% rate.

Other evidence demonstrated that Hoke County graduates fared poorly when it came to grades in core courses and that they consistently trailed behind the average grades attained by other public school graduates from around the state. Moreover, evidence con-

12. We note that there are many more examples demonstrating similar education shortcomings among Hoke County graduates (and a limited number of success stories as well). However, for the purposes of this opinion, the Court limits its evidentiary examples to those that provide the clearest snapshots of the overall picture presented at trial.

cerning college completion rates for Hoke County graduates revealed the following: (1) While 34.1% of all North Carolina public school graduates enrolled as freshman returned for a second year with a GPA of 2.0 or better, just 16.4% of Hoke County graduates did the same; (2) While 62.7% of all North Carolina public school graduates who entered the UNC system returned for their third year of college with a 2.0 GPA or better, only 44.4% of Hoke graduates did the same; and (3) From 1993-1997, 51.6% of all North Carolina high school students who entered the UNC system graduated within five years, while just 31.3% of Hoke County graduates did the same.

In assessing the evidence presented concerning Hoke County student post-secondary education prospects and achievements, the trial court concluded that Hoke graduates were "not well prepared to go on to community college or into the university system" and that such students, as a whole, performed inadequately in either collegiate environment. In addition, because obtaining the knowledge and skills needed to compete on an equal basis in post-education settings is one of the four elements defining a sound basic education, *see Leandro*, 346 N.C. at 347, 488 S.E.2d at 255, the trial court ruled that the evidence provided a clear showing that a great number of Hoke County graduates were failing to obtain such an education.

After reviewing the post-secondary education-related evidence and the trial court's conclusions concerning such evidence, this Court concludes that the trial court's ruling was premised on a clear evidentiary showing. As a consequence, we affirm the trial court on this issue.

Thus, to this point, we summarize our analysis. In the realm of "outputs" evidence, we hold that the trial court properly concluded that the evidence demonstrates that over the past decade, an inordinate number of Hoke County students have consistently failed to match the academic performance of their statewide public school counterparts and that such failure, measured by their performance while attending Hoke County schools, their dropout rates, their graduation rates, their need for remedial help, their inability to compete in the job markets, and their inability to compete in collegiate ranks, constitute a clear showing that they have failed to obtain a *Leandro*-comporting education. As a consequence of so holding, we turn our attention to "inputs" evidence—evidence concerning what the State and its agents have provided for the education of Hoke County students—in an effort to determine the following two contingencies: (1) Does the evidence support the trial court's conclusion that the State's

action and/or inaction has caused Hoke County students not to obtain a sound basic education and, if so; (2) Does such action and/or inaction by the State constitute a failure to meet its constitutional obligation to provide Hoke County students with the opportunity to obtain a sound basic education, as defined in *Leandro*?

It is one thing for plaintiffs to demonstrate that a large number of Hoke County students are failing to obtain a sound, basic public education. It is quite another for plaintiffs to show that such a failure is primarily the result of action and/or inaction of the State, which argues in this appeal that the trial court erred by concluding that a combination of State action and inaction resulted in the systematic poor performance of Hoke County students and graduates.

In defense of its educational offerings in Hoke County at trial, the State attempted to show that its combination of "inputs"—*i.e.*, expenditures, programs, teachers, administrators, etc.—added up to be an aggregate that met or exceeded this Court's definition of providing students with an opportunity for a sound basic education. In addition, both at trial and in this appeal, the State contended that the evidence showed the following: (1) That the educational offerings it provides in Hoke County have improved significantly since the mid-nineties; (2) That such improvements are part and parcel of the State's own recognition of ongoing problems and the need to address them; (3) That if a cognizable group of students within Hoke County are failing to obtain a sound basic education, it is due to factors other than the educational offerings provided by the State; and, (4) That many of the deficiencies that may exist in the educational offerings of Hoke County are due to the administrative shortcomings of the semi-autonomous local school boards.

Plaintiffs, on the other hand, contend that the evidence at trial clearly showed that the State had consistently failed to provide Hoke County schools with the resources needed to provide students with the opportunity to obtain a sound basic education. In addition, plaintiffs argue that the evidence shows that Hoke County students have consistently failed to match the achievements of their statewide counterparts (*see* "outputs" discussion, above) because the State has failed to: (1) provide adequate teachers and/or administrators; (2) provide the funding necessary to offer each student the opportunity to obtain a sound basic education; (3) recognize the failings of Hoke County students as a whole; and (4) implement alternative educational offerings that have and/or would address and correct the prob-

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

lems that have placed and/or place Hoke County students *at risk* of academic failure.[13]

In the portion of its order that addresses the "inputs" evidence introduced at trial, the trial court considered evidence concerning four components of the State's Educational Delivery System. In sum, the trial court found that the State's general curriculum, teacher certifying standards, funding allocation systems, and education accountability standards met the basic requirements for providing students with an opportunity to receive a sound basic education. As a consequence, the trial court concluded that "the bulk of the core" of the State's "Educational Delivery System . . . is sound, valid and meets the constitutional standards enumerated by *Leandro*."

After so concluding, the trial court then went on to describe its next two missions: (1) to determine whether the State's Education Delivery System is providing the means for Hoke County's students to avail themselves of an opportunity to obtain a sound basic education; and (2) to determine whether the State's Education Delivery System is providing the means for "at-risk" children to avail themselves of an opportunity to obtain a sound basic education. However, at some

---

13 From the outset of the trial court's introduction of the term "at risk," we take a moment to distinguish between the two uses of "at risk" within the context of this case (and which seem to have been merged into a single, interchangeable entity by all concerned).

Any student is, at least potentially, *at risk* of academic failure, without regard to his or her intellect, economic status, race, ethnic background, and/or social standing. However, a particular and identifiable subgroup of students has been singled out by experts in the education field and described as "at-risk" students. In a general sense, such students are those who, due to circumstances such as an unstable home life, poor socio-economic background, and other factors, either enter or continue in school from a disadvantaged standpoint, at least in relation to other students who are not burdened with such circumstances.

The students who are considered to be among those "at-risk" students raise distinct and separate concerns from other students. Certainly, like all students, "at-risk" students also face the risk of academic failure. However, one of the prominent issues in this case is determining whether such "at-risk" students need to be identified by the State and offered additional assistance in order to avail themselves of the opportunity for a sound basic education.

Thus, from this point on, for the sake of clarity, the Court will limit its use of the locution "at risk" to those instances where it serves as an adjective and pertains specifically to the student subgrouping described above (*e.g.*, must the State make special provisions for "at-risk" students?). As for those instances where the trial court or parties refer to students who may be *at risk of* academic failure, or who may be *at risk of* failing to integrate into society, we will substitute "faces the prospect of" for "at risk of" (*e.g.*, students who score below Level III proficiency on EOG tests *face the prospect* of academic failure).

## HOKE CTY. BD. OF EDUC. v. STATE

[358 N.C. 605 (2004)]

juncture in the proceedings, it appears that the trial court combined these two discrete inquiries into a single entity—namely, whether the "at-risk" children of Hoke County are being denied the opportunity to obtain a sound basic education.[14]

The distinction is far from technical or trivial. We refer back to the "outputs" evidence described and assessed by this Court at the beginning of Part IV, above. While we have already concluded that such evidence was ample to demonstrate that an inordinate number of Hoke County students have not obtained a sound basic education over the last decade, we have no way of determining whether: (1) such failure is strictly limited only to children who were "at-risk" students; or (2) such failure extended to other children who do not meet the definition of "at-risk" students.[15] Thus, if the trial court's conclusions and/or remedies target only "at-risk" students, it cannot be assumed that all or even most non "at-risk" students are being afforded their opportunity to obtain a sound basic education. Our review of the record reveals no showing, pro or con, that the plight

---

14. The Court recognizes that the trial court took evidence on, and made conclusions about, student performance across the state. However, we remain mindful that the issues of the instant case pertain only to evidence, findings, and conclusions that apply to Hoke County in particular. As a consequence, any findings or conclusions that were intended to apply to the state's school children beyond those of Hoke County are not relevant to the inquiries at issue.

15. For example, hypothetically, if 60% of all of Hoke County's ninth-graders failed to demonstrate Level III proficiency in EOC tests, it is essential to know, for purposes of both identifying and rectifying the failure, how many of those students were "at-risk" students and how many were not viewed as "at-risk." In its subsequent memoranda of law—numbers three and four—the trial court concludes that too many "at-risk" students are being denied their opportunity for a sound basic education, in violation of *Leandro*. The trial court also awards relief for such "at-risk" students and imposes remedies aimed at correcting their deficiencies. However, by limiting its conclusions to "at-risk" students, the trial court fails to account for the following contingency: how many of the 60% of Hoke County ninth-graders are not "at-risk" yet are nonetheless failing to obtain a sound basic education?

Although the evidence presented at trial fails to address or account for the circumstance that an inordinate number of non "at-risk" students may well be failing to achieve Grade III proficiency, this Court cannot ignore that distinct possibility. Thus, we emphasize that while the trial court limited its conclusions and relief to the "at-risk" students of Hoke County, a broader mandate may ultimately be required. Children who are not considered "at-risk" students may well be failing to obtain a sound basic education in inordinate numbers, and their failure may well be attributable to the State's actions and/or inactions. As a consequence, we conclude that while the findings and conclusions of the instant case are confined to the circumstances of "at-risk" students, non "at risk" students are *not*: (1) held or presumed to be obtaining a sound basic education, or (2) precluded from pursuing future claims that they are not being afforded the opportunity to obtain a sound basic education.

of non "at-risk" students in Hoke County was considered by the trial court in the wake of its second memorandum. As a consequence, while we must limit our review of the trial court's order to its conclusions concerning "at-risk" students, we cannot and do not offer any opinion as to whether non "at-risk" students in Hoke County are either obtaining a sound basic education or being afforded their rightful opportunity by the State to obtain such an education.

In confining the parameters of our holding to the trial court's findings and conclusions concerning "at-risk" students within the Hoke County school system, we turn our attention back to the trial court's evidentiary findings and conclusions relating to whether the State has adequately provided for Hoke County schools and whether the State has in place an ample mechanism for dealing "with the educational needs of ['']at-risk['] children."

In addition to finding that, as a general proposition, the State's Funding Delivery System for education was adequate, the trial court also concluded that it "is not yet convinced by the evidence that the State of North Carolina is not presently putting sufficient funds in place to provide each child with the equal opportunity to obtain a sound basic education." We note that the trial court went to great lengths in its efforts to convey its view that the evidence offered no definitive showing that the State's overall funding, resources, and programs scheme lacked the essentials necessary to provide a sound basic education. In addition, the trial court made clear that from an overall resources-providing perspective, the holding in *Leandro* established that a resources-providing scheme that includes local contributions is not constitutionally defective if it results in unequal funding for one LEA in comparison to another.

However, the trial court also made clear that, in its view, the applicable holding in *Leandro*, when stripped to its essence, was limited to circumstances in which such unequal funding resulted from local contributions that increased funding beyond that required to provide a sound basic education. In other words, while some LEAs may enjoy elevated funding beyond that which provides a sound basic education, no LEA may be funded in such a fashion that it fails to provide the resources required to provide the opportunity for a sound basic education. Thus, in the trial court's view, LEAs are entitled to funding by the State sufficient to provide all students, irrespective of their LEA, with at a minimum, the opportunity to obtain a sound basic education. We concur with the trial court's view.

With regard to the State's education resource allocations to Hoke County in particular, the trial court said it was convinced "that neither the State nor . . . [the Hoke County School System] are strategically allocating the available resources to see that at-risk children have the equal opportunity to obtain a sound basic education." Accordingly, the trial court initially directed the State and the school district "to conduct self-examinations of the present allocation of resources and to produce a rational[], comprehensive plan which strategically focuses available resources and funds towards meeting the needs of all children, including at-risk children[,] to obtain a sound basic education."

Concerning the State's argument that the trial court erred in concluding that the State was liable for its failings in Hoke County schools, we note that the trial court later modified this portion of its order to exclude the Hoke County School System from responsibility for correcting allocation deficiencies, reasoning that since the LEA was a subdivision of the State created solely by the State, it held no authority beyond that accorded it by the State. As a consequence of the LEA's limited authority, the trial court concluded that the State bore ultimate responsibility for the actions and/or inactions of the local school board, and that it was the State that must act to correct those actions and/or inactions of the school board that fail to provide a *Leandro*-conforming educational opportunity to students.

In the State's view, any holding that renders the State, and by the State we mean the legislative and executive branches which are constitutionally responsible for public education, accountable for local school board decisions somehow serves to undermine the authority of such school boards. This Court, however, fails to see any such cause and effect. By holding the State accountable for the failings of local school boards, the trial court did not limit either: (1) the State's authority to create and empower local school boards through legislative or administrative enactments, or (2) the extent of any powers granted to such local school boards by the State. Thus, the power of the State to create local agencies to administer educational functions is unaffected by the trial court's ruling, and any powers bestowed on such agencies are similarly unaffected. In short, the trial court's ruling simply placed responsibility for the school board's actions on the entity—the State—that created the school board and that authorized the school board to act on the State's behalf. In our view, such a conclusion bears no effect whatsoever on the local school board's ability to continue in administering those functions it currently oversees or

to be given broader and/or more independent authority. As a consequence, we hold that the State's argument concerning a diminished role for local school boards as a result of the trial court's ruling is without merit.

Although the trial court explained that it was leaving the "nuts and bolts" of the educational resources assessment in Hoke County to the other branches of government, it ultimately provided general guidelines for a *Leandro*-compliant resource allocation system, including the requirements: (1) that "every classroom be staffed with a competent, certified, well-trained teacher"; (2) "that every school be led by a well-trained competent principal"; and (3) "that every school be provided, in the most cost effective manner, the resources necessary to support the effective instructional program within that school so that the educational needs of all children, including at-risk children, to have the equal opportunity to obtain a sound basic education, can be met." Finally, the trial court ordered the State to keep the court advised of its remedial actions through written reports filed with the trial court every ninety days.

In support of its conclusions and orders for remedial action on the part of the State, the trial court declared that the evidence showed that there are many students in Hoke County schools "who are not obtaining a sound basic education." (*See* Part IV, above, pertaining to the analysis and discussion of "outputs" evidence.) In assessing whether the State's funding, resources, and programs for Hoke County schools met the needs of its students, the trial court considered evidence showing that "an unusually high number of Hoke County school children have factors" that categorize them as "at-risk" students,[16] and that such "at-risk" students have special needs in order to avail themselves of their guaranteed opportunity to obtain a sound basic education. In addition, the trial court considered evidence showing that the needs of such students were not being met, and concluded that the State's failure to meet such needs had significantly impacted such students' *opportunity* to obtain a sound basic education. Specifically, in the trial court's view, there was ample evidence demonstrating that the State was failing both to iden-

---

16. Although there are numerous accepted ways of defining and identifying an "at-risk" student, most educators seem in agreement that an "at-risk" student is generally described as one who holds or demonstrates one or more of the following characteristics: (1) member of low-income family; (2) participate in free or reduced-cost lunch programs; (3) have parents with a low-level education; (4) show limited proficiency in English; (5) are a member of a racial or ethnic minority group; (6) live in a home headed by a single parent or guardian.

tify "at-risk" students and to address their needs with educational resources that would provide tutoring, extra class sessions, counseling, and other programs that target "at-risk" students in an effort to enable them to compete among their non "at-risk" counterparts and thus avail themselves of their right to the opportunity to obtain a sound basic education.

In our view, the trial court conducted an appropriate and informative path of inquiry concerning the issue at hand. After determining that the evidence clearly showed that Hoke County students were failing, at an alarming rate, to obtain a sound basic education, the trial court in turn determined that the evidence presented also demonstrated that a combination of State action and inaction contributed significantly to the students' failings. Then, after concluding that the State's overall funding and resource provisions scheme was adequate on a statewide basis, the trial court determined that the evidence showed that the State's method of funding and providing for individual school districts such as Hoke County was such that it did not comply with *Leandro's* mandate of ensuring that all children of the state be provided with the opportunity for a sound basic education. In particular, the trial court concluded the State's failing was essentially twofold in that the State: (1) failed to identify the inordinate number of "at-risk" students and provide a means for such students to avail themselves of the opportunity for a sound basic education; and (2) failed to oversee how educational funding and resources were being used and implemented in Hoke County schools.

At that point, the trial court also concluded that the State's failings, as demonstrated by the evidence, needed to be rectified. As a consequence, it ordered the State to reassess both its financial allocations and its other resource provisions earmarked for Hoke County schools in order to make the schools more effective in addressing the trial court's primary concern—namely, to ensure that "at-risk" children in Hoke County are afforded a chance to take advantage of their constitutionally-guaranteed opportunity to obtain a sound basic education. In ordering the State to reassess its Hoke County educational obligations, the trial court struck a delicate balance between interests. On the one hand, it ordered the State to examine and find a resolution to a problem of constitutional proportion and imposed some general guidelines for doing so—*i.e.*, as the State reassesses its Hoke County educational obligations, it must structure its proposed solutions to ensure there are competent teachers in classrooms, compe-

tent principals in schoolhouses, and adequate resources to sustain instructional and support programs that will aid the county's school children to gain their opportunity to obtain a *Leandro*-comporting education. On the other hand, the trial court refused to step in and direct the "nuts and bolts" of the reassessment effort. Acknowledging that the state's courts are ill-equipped to conduct, or even to participate directly in, any reassessment effort, the trial court deferred to the expertise of the executive and legislative branches of government in matters concerning the mechanics of the public education process.

In short, the trial court: (1) informed the State what was wrong with Hoke County schools; (2) directed the State to reassess its educational priorities for Hoke County; and (3) ordered the State to correct any and all education-related deficiencies that contribute to a student's inability to take advantage of his right to the opportunity to obtain a sound basic education. However, we note that the trial court also demonstrated admirable restraint by refusing to dictate how existing problems should be approached and resolved. Recognizing that education concerns were the shared province of the legislative and executive branches, the trial court instead afforded the two branches an unimpeded chance, "initially at least," *see Leandro*, 346 N.C. at 357, 488 S.E.2d at 261, to correct constitutional deficiencies revealed at trial. In our view, the trial court's approach to the issue was sound and its order reflects both findings of fact that were supported by the evidence and conclusions that were supported by ample and adequate findings of fact. As a consequence, we affirm those portions of the trial court's order that conclude that there has been a clear showing of a denial of the established right of Hoke County students to gain their opportunity for a sound basic education and those portions of the order that require the State to assess its education-related allocations to the county's schools so as to correct any deficiencies that presently prevent the county from offering its students the opportunity to obtain a *Leandro*-conforming education.

## V. Proper School Age/Pre-Kindergarten

**[4]** The next two issues of the instant appeal by the State are outgrowths of one another. As a consequence, we address them in tandem. Initially, the State contends that the trial court erred when it ruled that the proper age for school children was a justiciable issue. In the State's view, the proper age at which children should be permitted to attend public school is a nonjusticiable political question

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

reserved for the General Assembly. To the extent that the State argues that establishing the proper age parameters for starting and completing school—*i.e.*, kindergarten, the entering class for public school students, shall be composed of five-year-olds—we agree. Article IX, Section 3 of the North Carolina Constitution provides that "[t]he General Assembly shall provide that every child of appropriate age . . . shall attend the public schools." Pursuant to such authority, the General Assembly has determined that five-year-olds *may* attend school and that seven-year-olds *must* attend school. N.C.G.S. §§ 115C-364, -378 (2003). Our reading of the constitutional and statutory provisions leads us to conclude that the determination of the proper age for school children has indeed been squarely placed in the hands of the General Assembly. In addition, the United States Supreme Court has defined issues as nonjusticiable when either of the following circumstances are evident: (1) when the Constitution commits an issue, as here, to one branch of government; *or* (2) when satisfactory and manageable criteria or standards do not exist for judicial determination of the issue. *Baker v. Carr*, 369 U.S. 186, 210, 7 L. Ed. 2d 663, 682 (1962). In our view, not only are the applicable statutory and constitutional provisions persuasive in and of themselves, but the evidence in this case demonstrates that the trial court was without satisfactory or manageable judicial criteria that could justify mandating changes with regard to the proper age for school children. Thus, with regard to the issue of whether the trial court erred by interfering with the province of the General Assembly—establishing the appropriate age for students entering the public school system—we conclude that the trial court did so err. First, our state's constitutional provisions and corresponding statutes serve to establish the issue as the exclusive province of the General Assembly and, second, there was no evidence at trial indicating the trial court had satisfactory or manageable criteria that would justify modifying legislative efforts. As a consequence, the Court holds that any trial court rulings that infringed on the legislative prerogative of establishing school-age eligibility were in error.

[5] However, when considered in the context of the related issue of pre-kindergarten programs, the crux of this issue is less about whether school must be offered to four-year-olds than it is about whether the State must help prepare those students who enter the schools to avail themselves of an opportunity to obtain a sound basic education. While the General Assembly may be empowered to establish the actual age for beginning school, the question of whether the

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

General Assembly must address the particular needs of children prior to entering the school system is a distinct and separate inquiry. For example, the General Assembly, in its discretion, could establish that mandatory school attendance begins at four years of age, five years of age, or six years of age. However, the State's power to establish such an age does not answer the question of whether or not it must address the particular needs of those children who are, or are approaching, the established age for school admission. Thus, the issue before us is less about "at-risk" four-year-olds than it is about "at-risk" children approaching and/or attaining school-age eligibility as established by the General Assembly.

In our view, the evidence presented at trial clearly supported these findings and conclusions by the trial court: (1) A large number of Hoke County students had failed to obtain a sound basic education; (2) A large number of Hoke County students were being denied their rightful opportunity to a sound basic education because the State had failed in its duty to provide the necessary means for such an opportunity; (3) There were an inordinate number of "at-risk" students attending Hoke County schools; (4) The special needs attendant to such "at-risk" students were not being met; and (5) It was ultimately the State's responsibility to meet the needs of "at-risk" students in order for such students to avail themselves of their right to the opportunity to obtain a sound basic education. *See* Part IV, above. In addition to ordering the State to reassess its resource allocations to Hoke County schools in an effort to improve them for students currently in attendance, the trial court heard evidence concerning the plight of those children who were about to enter the school system. Plaintiffs essentially argued that such evidence was relevant because it would show that the problem of "at-risk" students extended beyond those students already in school and would thereby support additional remedies that specifically targeted incoming students. Once the problems of "at-risk" students had been demonstrated at trial, it was not beyond the reach of the trial court to hear evidence concerning whether preemptive action on the part of the State might assist in resolving the problems of such "at-risk" students. Thus, we conclude that because the evidence presented showed that "at-risk" students in Hoke County were being denied their right to an opportunity to obtain a sound basic education, the trial court properly admitted additional evidence intended to show that preemptive action on the part of the State should target those children about to enroll, recognizing that preemptive action affecting such children prior to their entering the public schools might well be

far more cost effective than waiting until they are actually in the educational system.

We now turn our attention to the trial court's findings and conclusions concerning "at-risk" children who are or were about to enter the Hoke County school system. In paragraph 74a of their complaint, plaintiffs alleged that "many ['at-risk'] children living in [Hoke County] begin public school kindergarten at a severe disadvantage. They do not have the basic skills and knowledge needed for kindergarten and as a foundation for the remainder of . . . school." Plaintiffs also alleged that "the lack of pre-kindergarten services and programs" offered in Hoke County deprived such students from receiving their opportunity for a sound basic education, and said that [Hoke County] schools "do not have sufficient resources to provide the pre-kindergarten and other programs and services needed for a sound basic education." As relief for the allegations raised in paragraph 74a, plaintiffs sought an order from the trial court that would, in essence, compel the State to provide remedial and preparatory pre-kindergarten services to "at-risk" four-year-olds in Hoke County.

In assessing the evidence presented at trial pertaining to the allegations of paragraph 74a, the trial court found: (1) that there was an inordinate number of "at-risk" children who were entering the Hoke County school district; (2) that such "at-risk" children were starting behind their non "at-risk" counterparts; and (3) that such "at-risk" children were likely to stay behind, or fall further behind, their non "at-risk" counterparts as they continued their education. In addition, the trial court found that the evidence showed that the State was providing inadequate resources for such "at-risk" prospective enrollees, and that the State's failings were contributing to the "at-risk" prospective enrollees' subsequent failure to avail themselves of the opportunity to obtain a sound basic education. In support of its findings, the trial court tracked and noted the number and percentage of prospective enrollees who ultimately entered Hoke County schools as "at-risk" students, and referred to other evidence demonstrating the students' lack of success as they continued through school. As for evidence concerning the State's failure to identify such "at-risk" prospective enrollees and its failure to provide remedial services so such "at-risk" students could avail themselves of a *Leandro*-conforming educational opportunity, the trial court found that the State's current remedial programs for "at-risk" prospective enrollees in Hoke County were limited to three pre-kindergarten

classes serving eighteen students each. Other testimony at trial indicated that besides the fifty-four students who were attending such remedial classes, there were over 300 more who would benefit from such classes. The trial court additionally noted that the three class offerings were funded by a combination of state "Smart Start" and federal "Title One" monies.

As a consequence of its findings, the trial court concluded that State efforts towards providing remedial aid to "at-risk" prospective enrollees were inadequate. To that point in the proceedings, we agree with the trial court, and hold that the evidence supports its findings of fact and that its findings support its conclusions of law. In our view, judging by its actions, it appears that even the State concedes that "at-risk" prospective enrollees in Hoke County are in need of assistance in order to avail themselves of their right to the opportunity for a sound basic education. Yet there is a marked difference between the State's recognizing a need to assist "at-risk" students prior to enrollment in the public schools and a court order compelling the legislative and executive branches to address that need in a singular fashion. In our view, while the trial court's findings and conclusions concerning the problem of "at-risk" prospective enrollees are well supported by the evidence, a similar foundational support cannot be ascertained for the trial court's order requiring the State to provide pre-kindergarten classes for either all of the State's "at-risk" prospective enrollees or all of Hoke County's "at-risk" prospective enrollees. Certainly, when the State fails to live up to its constitutional duties, a court is empowered to order the deficiency remedied, and if the offending branch of government or its agents either fail to do so or have consistently shown an inability to do so, a court is empowered to provide relief by imposing a specific remedy and instructing the recalcitrant state actors to implement it. *See, e.g.,* *Reynolds v. Sims,* 377 U.S. 533, 552, 12 L. Ed. 2d 506, 521 (1964) (upholding order adopting a temporary reapportionment plan for Alabama legislature to ensure the plan complied with equal protection requirements); *Faulkner v. Jones,* 10 F.3d 226, 228-29 (4th Cir. 1993) (affirming lower court's order requiring that the Citadel, an all-male state military college, allow female plaintiff to enroll in its day program); *N.Y. State Ass'n for Retarded Children v. Rockefeller,* 357 F. Supp. 752, 768-69 (E.D.N.Y. 1973) (ordering recalcitrant state school to hire additional staff and make specific repairs as a means to ensure that the institution would meet minimum standards); *Stephenson v. Bartlett,* 357 N.C. 301, 304-05, 582 S.E.2d 247, 249-50 (2003) (referring to the Court's prior approval of a trial court's

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

interim redistricting maps for use in the 2002 elections). However, such specific court-imposed remedies are rare, and strike this Court as inappropriate at this juncture of the instant case for two related reasons: (1) The subject matter of the instant case—public school education—is clearly designated in our state Constitution as the shared province of the legislative and executive branches; and (2) The evidence and findings of the trial court, while supporting a conclusion that "at-risk" children require additional assistance and that the State is obligated to provide such assistance, do not support the imposition of a narrow remedy that would effectively undermine the authority and autonomy of the government's other branches.[17]

While this Court assuredly recognizes the gravity of the situation for "at-risk" prospective enrollees in Hoke County and elsewhere, and acknowledges the imperative need for a solution that will prevent existing circumstances from remaining static or spiraling further, we are equally convinced that the evidence indicates that the State shares our concerns and, more importantly, that the State has already begun to assume its responsibilities for implementing corrective measures. At the time of the trial, Smart Start, a public-private partnership that provides funds for early childhood welfare programs, was already in place. While Smart Start is not principally a pre-kindergarten education program, monies from the program often help LEAs establish and maintain pre-kindergarten classes. Hoke County and Charlotte-Mecklenburg schools were among a group of LEAs that operated such programs when this case was being heard. Although evidence at trial indicated that the State and Charlotte-Mecklenburg schools were at odds over the effectiveness of the latter's Bright Beginnings program, other testimony and evidence showed that State officials: (1) recognized the need for, and effectiveness of, early intervention programs like pre-kindergarten; and

17. In its brief and at oral argument, the State argued two points on the issue of the pre-kindergarten remedy. First, the State contended that the trial court erred *if* it ordered the pre-kindergarten remedy because this Court, in *Leandro*, established a separate constitutional right to pre-kindergarten for "at-risk" prospective enrollees in Hoke County schools. We agree with the State's contention and declare that no such attendant right was established within the parameters of *Leandro*.

The State also argued that the trial court erred *if* it imposed the pre-kindergarten remedy as relief for a violation of "at-risk" children's rights because, in the State's view, the record does not support a determination that the State has violated the constitutional rights "of any party, or of any student." While we hold that the remedy at issue was not supported by the evidence, findings, and conclusions of the trial court's order, we clearly disagree with the State's contention that the trial court did not conclude there was a State violation of Hoke County students' right to the opportunity to obtain a sound basic education. *See* Part IV, above.

(2) had authorized the establishment of such programs by LEAs that desired them.

Meanwhile, plaintiffs and even the trial court seem to suggest that the State's claims and evidence concerning the issue amounted to little more than lip service, and that the evidence at trial more accurately reflected a showing that the State, to the point of the trial, had done nothing to provide for a statewide pre-kindergarten program and had done nothing to expand pre-kindergarten services to the nearly 300 other Hoke County "at-risk" prospective enrollees who were eligible for such classes. In further support of that view, this Court notes that among all the reports submitted to the trial court by the State since the trial concluded,[18] the State makes no mention of its efforts, continuing or otherwise, on behalf of "at-risk" prospective enrollees in Hoke County. But even if this Court were to concur fully with plaintiffs' view, we note that the question before us does not concern the extent of the State's compliance with the trial court's order regarding pre-kindergarten for "at-risk" prospective enrollees in Hoke County schools, but *whether the State must comply* with that portion of the order. In our view, there is inadequate foundational support for an order that compels the State to provide pre-kindergarten services for all "at-risk" prospective enrollees in Hoke County. At this juncture, the suggestion that pre-kindergarten is the sole vehicle or, for that matter, a proven effective vehicle by which the State can address the myriad problems associated with such "at-risk" prospective enrollees is, at best, premature.

The evidence shows that the State recognizes the extent of the problem—its deficiencies in affording "at-risk" prospective enrollees their guaranteed opportunity to obtain a sound basic education—and its obligation to address and correct it. However, a single or definitive means for achieving constitutional compliance for such students has yet to surface from the depths of the evidentiary sea. Certainly, both sides have conceded that pre-kindergarten is, and can be, an effective method for preparing "at-risk" prospective enrollees for the rigors of their forthcoming education. Nevertheless, neither side has demonstrated to the satisfaction of this Court that it is either the only qualifying means or even the only known qualifying means. The state's

---

18. The post-trial reports from the State are the result of the trial court's order requiring that the State report every ninety days of its progress in implementing the trial court's remedies. The record in this case has been supplemented, at the request of this Court, with copies of both those reports and the responses from the trial court.

**HOKE CTY. BD. OF EDUC. v. STATE**

[358 N.C. 605 (2004)]

legislative and executive branches have been endowed by their creators, the people of North Carolina, with the authority to establish and maintain a public school system that ensures all the state's children will be given their chance to get a proper, that is, a *Leandro*-conforming, education. As a consequence of such empowerment, those two branches have developed a shared history and expertise in the field that dwarfs that of this and any other Court. While we remain the ultimate arbiters of our state's Constitution, and vigorously attend to our duty of protecting the citizenry from abridgments and infringements of its provisions, we simultaneously recognize our limitations in providing specific remedies for violations committed by other government branches in service to a subject matter, such as public school education, that is within their primary domain. Thus, we conclude that the trial court erred when it imposed at this juncture of the litigation and on this record the requirement that the State must provide pre-kindergarten classes for all "at-risk" prospective enrollees in Hoke County. In our view, based on the evidence presented at trial, such a remedy is premature, and its strict enforcement could undermine the State's ability to meet its educational obligations for "at-risk" prospective enrollees by alternative means. As a consequence, we reverse those portions of the trial court order that may be construed to the effect of requiring the State to provide pre-kindergarten services as the remedy for constitutional violations referenced in Part V of this opinion.

## VI. Federal Funds

[6] Although plaintiff-intervenors have not yet presented their case before the trial court, this Court allowed certiorari for review of plaintiff-intervenors' issue concerning the trial court's ruling on the State's use of federal funds targeting education. We address the issue now for two reasons. First, the trial court allowed plaintiff-intervenors' motion to participate in plaintiffs' trial. Therefore, plaintiff-intervenors have a right, as party participants, to complain of errors committed during plaintiffs' proceedings. Second, the issue raised by plaintiff-intervenors will affect the scope of plaintiff-intervenors' forthcoming trial. As a consequence, we address the issue here in order to preempt the potential for error during plaintiff-intervenors' case.

Plaintiff-intervenors contend that the trial court erred by including educational services provided by federal funds, including Title I

funds,[19] as part of its calculations for determining whether the State has met its constitutional obligation to provide all North Carolina children with an equal opportunity to obtain a sound basic education. Plaintiff-intervenors' argument requires us to conduct a two-part inquiry: (1) did the trial court improperly condone the State's use of Title I funds, in violation of 20 U.S.C. § 6321(b)(1); and, (2) did the trial court improperly condone the State's use of such federal funds, in violation of the North Carolina Constitution?

For the reasons cited herein, we conclude that the trial court's consideration of Title I funds did not violate either the applicable federal statutory provisions or the education provisions of our state's Constitution. In addition, we hold that the relevant provisions of the North Carolina Constitution do not forbid the State from including federal funds in its formula for providing the state's children with the opportunity to obtain a sound basic education. While the State has a duty to provide the means for such educational opportunity, no statutory or constitutional provisions require that it is concomitantly obliged to be the exclusive source of the opportunity's funding. In fact, the State and its education agents often position themselves to augment state educational funding requirements by designing and implementing education-related programs—*i.e.*, Bright Beginnings— that qualify for federal subsidies, thereby providing education funds that contribute to the State's effort of providing a *Leandro*-conforming educational opportunity for North Carolina's children.

While the questions of whether federal funds are "supplanting" or "supplementing" state education contributions and whether they must do one or the other are debated vigorously by the parties, *see* 20 U.S.C. § 6321(b)(1) (requiring that federal funds received thereunder be used only to supplement funds that would be made available from non-federal sources and not to supplant such non-federal funds), we decline to enter the fray at this point for two reasons. First, the questions concerning the proper use of federal education funds are controlled by federal law, which specifically grants the United States Secretary of Education ("Secretary") the authority to decide how such funds are distributed. *See id.* § 1234(a) (2002) (stating that the Secretary shall establish an Office of Administrative Law Judges which shall conduct hearings on recovery of and withholding of

---

19. Title I is now incorporated in the "No Child Left Behind Act of 2001," Pub. L. No. 107-110, 115 Stat. 1439, 20 U.S.C. § 6301-6578. In order to remain consistent with the parties' briefs, and with the trial court's order, we refer to No Child Left Behind funds as Title I funds.

funds); *and Bell v. New Jersey*, 461 U.S. 773, 791, 76 L. Ed. 2d 312, 327 (1983) (stating that "the initial determination" that a State has misapplied Title I funds "is to be made administratively," by the Secretary). Thus, the question of deciding precisely what constitutes a supplementation or a supplantation, a complex question of federal law that this Court is ill-positioned to answer, is one that the federal statutory scheme clearly places in the hands of the Secretary. While plaintiff-intervenors argue that the facts in evidence show that certain North Carolina programs violate the "supplement-not-supplant" mandate, we note that plaintiff-intervenors point to no instance where the Secretary has either refused or withdrawn funding because such funds were being used in violation of 20 U.S.C. § 6321(b)(1). Second, we can find no evidence of clear fault on the part of the State from the funding examples presented at trial or in the plaintiff-intervenors' appellate brief. As a consequence, we can glean from the record no justification that would compel this Court to trespass on the Secretary's deeded turf.

We recognize that if the Secretary, at some point, were to determine that the State was no longer adhering to the "supplement-not-supplant" provisions governing use of federal education funds, this Court may have to reconsider the issue in order to decide: (1) if the funding in question was part of the State's effort to provide children with a sound basic education; and (2) whether the State was obliged to provide substitute funding on its own. However, because such a circumstance has not presented itself in the case at hand, any holding as to its potential effects would amount to mere speculation on the part of this Court. Therefore, in confining our view of the issue to the facts as presented at trial, we conclude that the trial court did not err when it determined that the State was making use of federal education funds in accordance with the applicable federal statutes and the applicable education provisions of the North Carolina Constitution.

\*\*\*\*\*\*\*\*\*\*\*\*

In closing, we recount in summary the Court's major conclusions and holdings concerning the issues of the case before us. Initially, this Court affirms the trial court's conclusion that plaintiffs have made a clear showing that an inordinate number of students in Hoke County are failing to obtain a sound basic education and that defendants have failed in their constitutional duty to provide such students with the opportunity to obtain a sound basic education. In addition, this Court affirms the trial court's ruling that the State must act to correct those deficiencies that were deemed by the trial court as con-

tributing to the State's failure of providing a *Leandro*-comporting educational opportunity.

As for the State's contention that it is the sole arbiter of determining the proper age for attending schools, we agree. Concerning the trial court's remedy for the State's failure to provide Hoke County prospective enrollees with an opportunity to avail themselves of a sound basic education, we reverse. In our view, the trial court's mandate requiring the State to offer pre-kindergarten services to "at-risk" prospective enrollees would be, at this juncture, a premature judicial encroachment on a core function of our state's legislative and executive branches.

In addition, we affirm the trial court's ruling concerning the State's use of federal contributions in designing and implementing an education financing scheme. In our view, the question of whether federal funds are properly being utilized by the State is one best answered by consulting the federal statutory framework that provides for such funds. As the clear language of the applicable statutes expressly grants the Secretary the power to decide the question of whether state expenditures of federal education funds comports with federal law, we defer to the Secretary's judgment and note that there was no evidence at trial showing that the State's use of such funds had spurred retaliatory action by the Secretary. As a consequence, we can find no error in the trial court's ruling that the State's use of federal education funds did not violate either federal law or our state's Constitution.

As for the pending cases involving either other rural school districts or urban school districts, we order that they should proceed, as necessary, in a fashion that is consistent with the tenets outlined in this opinion.

Finally, the Court notes that the original Constitution of our state, adopted on 18 December 1776, included the specific provision "[t]hat a school or schools shall be established by the legislature, for the convenient instruction of youth." N.C. Const. of 1776, para. 41. Some months before, William Hooper, one of North Carolina's delegates to the Continental Congress in Philadelphia, had solicited information from John Adams as to his thoughts on what should be included in a soon-to-be drafted constitution for North Carolina. Modern historians note that at the time, Adams was considered a "renowned authority on constitutionalism," John V. Orth, *The North Carolina State Constitution: A Reference Guide* 2 (1993), and that as he contemplated the future of the country, Adams became convinced that its

success rested on education, *see* David McCullough, *John Adams*, 364 (Simon & Schuster 2001).

Adams, in subsequent correspondence, wrote: "[A] memorable change must be made in the system of education[,] and knowledge must become so general as to raise the lower ranks of society nearer to the higher. The education of a nation[,] instead of being confined to a few schools and universities for the instruction of the few, must become the national care and expense for the formation of the many." *Id.*

This Court now remands to the lower court and ultimately into the hands of the legislative and executive branches, one more installment in the 200-plus year effort to provide an education to the children of North Carolina. Today's challenges are perhaps more difficult in many ways than when Adams articulated his vision for what was then a fledgling agrarian nation. The world economy and technological advances of the twenty-first century mandate the necessity that the State step forward, boldly and decisively, to see that all children, without regard to their socio-economic circumstances, have an educational opportunity and experience that not only meet the constitutional mandates set forth in *Leandro*, but fulfill the dreams and aspirations of the founders of our state and nation. Assuring that our children are afforded the chance to become contributing, constructive members of society is paramount. Whether the State meets this challenge remains to be determined.

AFFIRMED IN PART AS MODIFIED, AND REVERSED IN PART.